UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CURTIS L. BOSISTO and JILL BOSISTO, individually and as guardians for J.L.B., and J.L.B., a minor child,<br><br>                        Plaintiffs,<br><br>     v.<br><br>MARCIE A. FREEMAN, in her individual capacity and as an official of the State of Oregon; OREGON DEPARTMENT OF HUMAN RESOURCES,<br><br>                        Defendants. | 6:16-cv-372-JR<br><br>ORDER |

RUSSO, Magistrate Judge:

Plaintiffs, Curtis Bosisto and Jill Bosisto, individually and as guardians ad litem for J.L.B., bring this action alleging violations of their Fourth and Fourteenth Amendment rights via interference with familial association against defendants Marcie Freeman and the Oregon Department of Human Services.[1] Defendants move for summary judgment and plaintiffs move to

---

[1] The caption to plaintiffs' amended complaint also lists an intentional infliction of emotional distress claim, but the claim does not appear in the body of the complaint.

file a second amended complaint. The Court heard oral argument on May 9, 2017. The motion for summary judgment is granted in part and denied in part; and the motion to amend is denied.

BACKGROUND

Plaintiffs initiated this action on February 27, 2016 alleging J.L.B., the minor child of Jill and Curtis Bosisto, was interrogated and involuntarily removed from her middle school by Oregon Department of Human Services case worker Marcie Freeman. This removal was accomplished absent a warrant or court order and without indication of imminent danger or threat to the safety of J.L.B. Plaintiffs further allege defendant Freeman removed J.L.B. from her parents home and placed her with her grandmother, where she remained for about three weeks, without filing a petition for removal. Plaintiffs assert a substantive due process claim based on interference with familial association, a procedural due process claim based on the removal absent a post-deprivation hearing, and an unlawful seizure claim based on J.L.B.'s removal absent exigent circumstances.

A. Defendants' Allegations

Defendants' factual background comes primarily from defendant Freeman's Assessment Summary generated to document the investigation of alleged child abuse. See Ex. 2 attached to the Amended Declaration of Marcie A. Freeman (#48).

On March 5, 2014, defendant Freeman, along with Springfield Police Officer Turner, responded to a report of potential child abuse at J.L.B.'s school and conducted an investigation. A reporting resource (RS), a school worker, reported that J.L.B. described her home life as unbearable. RS further reported that J.L.B. makes herself throw-up on a daily basis and cuts herself. RS stated that J.L.B. is depressed and her grades have dropped drastically. RS also reported that both of

---

See Amended Complaint (#11). Therefore, the court will not consider this claim.

J.L.B.'s parents tell her she is fat. Id. at p. 2. See also Ex. 1 (Turner's Investigative Report) attached to Declaration of Sharia Mayfield (#47). Freeman's summary also indicated that J.L.B. was suspended for one week in February for bringing her father's marijuana pipe to school. Ex. 2 attached to the Amended Declaration of Marcie A. Freeman (#48) at p. 5.

      J.L.B. told Freeman that her father laughed at her when she asked for counseling, he tried to break her arms, and punched her. J.L.B. further reported her father kicked her mother requiring a trip to the hospital. J.L.B. also reported her father follows her around the house yelling at her, stating she is a worthless horrible person, and she should just kill herself. Finally, J.L.B. stated that her father told her he is done parenting her and he is going to cut her off from food and clothing. Id. at pp. 2-3, 7-8 . J.L.B. also made statements of suicidal ideation. Id. at pp. 5, 8.

      RS reported they believe the father is angry with J.L.B. because she discovered and exposed that he was having an affair. It was also reported the father drinks heavily and has a medical marijuana card. The mother is reported to possibly have mental health issues and "is on a lot of pills." Id. at p. 3.

      Both defendant Freeman and Officer Turner viewed cut marks on J.L.B.'s arm. Id. at p. 5; Ex. 1 (Turner's Investigative Report) attached to Declaration of Sharia Mayfield (#47). Based on J.L.B.'s statement and the cuts on her arms, law enforcement transported J.L.B. to Sacred Heart Medical Center's Emergency Department for mental health evaluation. Id.[2]

---

[2] Defendant Freeman asserts Officer Turner decided it was prudent to take J.L.B. to the hospital. Amended Declaration of Marcie A. Freeman (#48) at ¶ 9. Officer Turner's report indicates that "[b]ased on [J.L.B.'s] comments and cuts to her arms, she was taken to the Johnson Unit and released to Staff." Ex. 1 (Turner's Investigative Report) attached to Declaration of Sharia Mayfield (#47). David Neal, LPC, who interviewed J.L.B. on Dr. Brad Anderson's behalf, stated "[w]hile being interviewed by DHS worker, Marcy, the patient admitted to having suicidal ideation which caused the DHS to ask SPD to take the patient to the emergency

Defendant Freeman next interviewed J.L.B.'s parents at their home accompanied by Springfield Police detective Jeff Martin. Ex. 2 attached to the Amended Declaration of Marcie A. Freeman (#48) at p. 8. The parents denied making statements that J.L.B. is fat, the mother denied domestic abuse, but did express a desire to leave the relationship due to the father's drinking. The parents agreed to allow J.L.B. to stay at her grandmother's home while Freeman gathered more information. Id. Freeman observed the father's "aggressive demeanor" and he told her he drank "four to six beers a day." Amended Declaration of Marcie A. Freeman (#48) at ¶ 11. Freeman told the mother it would be fine for her to have contact with J.L.B., but requested that the father have no contact. Id. at ¶ 14.

Defendant Freeman next interviewed J.L.B.'s grandmother who confirmed concerns about domestic violence by the father and was "more than happy to have J.L.B. stay with her." Id. at ¶ 16. Freeman went to the hospital to inform J.L.B. who was reportedly excited to be staying with her grandmother. Id. at ¶ 17.

Defendant Freeman continued the investigation, but on March 25, 2014, she received letters from J.L.B.'s parents' counsel asking her to refrain from any contact with them and informed her they would collect J.L.B. from grandmother's house and return her home immediately. Id. at ¶¶ 19-20. In April 2014, Freeman concluded she did not have sufficient information to determine whether J.L.B. was in danger. Id. at ¶ 22.

B.  Plaintiffs' Allegations

---

department for a mental health evaluation." Ex. 2 attached to Declaration of Sharia Mayfield (#47) at p. 2.

1. J.L.B.'s Statement

J.L.B. states between February and March, 2014, she was experiencing depression and could not control it. Her teachers were concerned and asked about her home life and she responded that her parents and especially her dad were upset with her for being suspended. She stated that for a short time she cut herself. The teachers did not inform J.L.B.'s parents of their concerns. Declaration of J.L.B. (#42) at ¶ 2.

On March 5, 2014, J.L.B.'s teacher escorted her to an office where a police officer and Freeman waited for her. Freeman stared at J.L.B. and intimidated her. When Freeman finally asked J.L.B. to tell her what was going on, J.L.B. started to cry and stated she did not know--thinking she was in some kind of trouble. Freeman repeatedly asked whether J.L.B.'s parents abused her. J.L.B. responded "no, the most [my father] ever touched me is that maybe he grabbed my arm once but it wasn't out of anger." Id. at ¶ 3. J.L.B. felt that Freeman was trying to put words in her mouth and then "Ms. Freeman decided that I needed to be 'evaluated' at the hospital." Id.

The police officer agreed to drive her to the Johnson Unit. Id. at ¶ 4. Freeman arrived at the hospital with J.L.B.'s grandmother late that day and insisted that she remain at the hospital another one to three days. The doctor said there were no concerns and that J.L.B. would be released. Id. at ¶ 4.

Defendant Freeman told J.L.B. her parents thought she was a disappointment, she would not be allowed to see them, and she was probably going to live with her grandmother who was moving to Mexico soon. Id. at ¶ 5.

J.L.B. stayed with her grandmother for one month. Id. at ¶ 6. During that time, Freeman told her if she talked to her father or even set foot near her home, her father would go to jail and she

would be put up for adoption. Freeman also told her how much her parents did not like her, she was a brat, a hoodlum, manipulative, and ignorant, but she could be someone else if she wasn't around her father. She was only allowed to talk to her mother by phone for a few minutes at a time. Id. at ¶ 6.

J.L.B. states she is not bulimic and never had an eating disorder nor had she ever imagined committing suicide. She also states her parents never physically harmed her or each other. Id. at ¶¶ 8-9.

2.      Jill Bosisto's Statement

J.L.B.'s mother, Jill Bosisto, states that in February 2014, J.L.B. got in some trouble at school with another girl who possessed a marijuana pipe. She grounded her and had her drug tested (with negative results). Declaration of Jill Bosisto (#45) at ¶ 2.

After that, she did notice some mood changes, but J.L.B. explained it was because she was upset about getting in trouble. Jill Bosisto did not know that J.L.B. was being bullied at school and often cried at school. The only information she received from the school around this time period was a phone call stating that J.L.B. was doing fine at school. Id. at ¶ 3.

On March 5, 2014, Jill Bosisto met with Freeman and a police officer at her home where Freeman interrogated her and her husband about their parenting and her husband's drinking. Her husband stated he drank a couple of beers in the evening. Both parents stated they did not abuse J.L.B. Id at ¶ 6.

Freeman instructed the officer to look around. The officer found nothing. Freeman next accused them of "being bad parents for not taking J.L.B. to many places" and isolating her. Id. Freeman then pulled Jill Bosisto aside and told her if she admitted her husband was abusive, she

would return her daughter and get them a hotel room. Freeman kept repeating to Jill Bosisto that if she admitted her husband's abuse, she would return J.L.B. Jill Bosisto refused to make that admission. Finally, Freeman told the Bosisto's that J.L.B. would not return home and requested information about the grandmother so that J.L.B. could stay there. Freeman told them the father was to have no contact with J.L.B. or both parents would go to jail. Id. at ¶¶ 6-8.

Freeman told Jill Bosisto she no longer had authority over J.L.B. because she was not honest about the abuse and had forfeited her parental rights. She repeated that under no circumstances would the father be permitted to have contact with J.L.B. and Jill Bosisto's contact would be very limited at Freeman's discretion or both parents would be arrested. Id. at ¶ 8.

The Bosistos were not told that J.L.B. had been taken to the Johnson Unit or that she had been interviewed by DHS. Jill Bosisto states she was not informed of any rights, given notice of a hearing or provided with documentation of any kind. She had no further contact with DHS. Id. at ¶¶ 9-10.

Jill Bosisto tried to obtain information from DHS on returning J.L.B. home to no avail. After three weeks the Bosisto's contacted an attorney who wrote letters demanding J.L.B.'s return and instructed the Bosisto's to retrieve their daughter from grandmother's house. Id. at ¶13.

3. Maxine Weiss' Statement

J.L.B.'s grandmother, Maxine Weiss, states defendant Freeman approached her on March 5, 2014 and asked her if J.L.B. could stay with her because she was at the hospital and needed to be picked up. Declaration of Maxine Weiss (#44) at ¶ 1. Freeman informed Weiss she was appointing her to be J.L.B.'s guardian, J.L.B.'s father was to have no contact with J.L.B., and her mother was to have limited contact. Freeman further informed her it was her duty to take care of J.L.B. until

Page 7 - ORDER

further instruction. Id. at ¶ 2.

Weiss told Freeman she was leaving for Mexico soon and Freeman responded it would be a good idea for J.L.B. to travel with her and enroll in school there. Id. at ¶ 2. Freeman informed Weiss that if she did not follow her instructions she would be breaking the law and Freeman would now be making the parenting decisions regarding J.L.B. Id. at ¶ 3.

J.L.B. stayed with Weiss for about a month under Freeman's order. J.L.B. told Weiss Freeman informed her she would be adopted by one of her teachers because her parents were leaving her. Weiss returned J.L.B. to her parents when they hired a lawyer. Weiss never heard from Freeman again. Id. at ¶ 4-5.

## DISCUSSION

Defendants argue summary judgment is appropriate because there are no genuine issues of material fact that: (1) J.L.B.'s parents consented to her placement with her grandmother as part of an agreed protective plan; (2) Freeman acted reasonably in believing J.L.B.'s parents were cooperating in a protective plan entitling her to qualified immunity; and/or (3) Freeman acted reasonably under exigent circumstances.

As noted above, plaintiffs allege Fourteenth Amendment claims of substantive and procedural due process as well as a Fourth Amendment claim of unlawful seizure.

A.  Substantive Due Process

To establish a substantive due process claim, plaintiffs must first show a government deprivation of life, liberty, or property. See Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998). The concept of substantive due process forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit

in the concept of ordered liberty. United States v. Salerno, 481 U.S. 739, 746 (1987).

Parents and children have a well-elaborated constitutional right to live together without governmental interference. Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. Id. at 1136-37.

Before Freeman's acts can be declared a violation of substantive due process, however, plaintiffs must show her actions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. Cf. Village of Euclid Ohio v. Ambler Realty Co., 272 U.S. 365, 395 (1926) (applying standard to zoning ordinance). Where, as here, there is an alleged abuse of executive action, only the most egregious official conduct can be said to be arbitrary in the constitutional sense. County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).

Assuming plaintiffs' version of the facts, Freeman's acts do not rise to the necessary level of egregiousness. It is undisputed that J.L.B. was suffering some depression and had resorted to cutting herself. Whether such facts merited seizing J.L.B. for a medical evaluation[3] and then removing her from her parent's home is addressed below, but plaintiffs cite no authority that such conduct can be said to be arbitrary, or conscience shocking. Defendants, on the other hand, note that even unwise excess zeal is insufficient to state a substantive due process claim. Webb v. McCullough, 828 F.2d 1151, 1158 (6th Cir. 1987) (in the context of disciplinary corporal punishment, the question is

---

[3]As noted, defendants assert Freeman is not responsible for J.L.B.'s transport to the Johnson unit. There is, however, an issue of fact as to whether Freeman directed Officer Turner, under her legal authority, to transport J.L.B. to the emergency department. See Ex. 2 attached to Declaration of Sharia Mayfield (#47) at p. 2. (DHS asked SPD to take the patient to the emergency department for a mental health evaluation).

whether the conduct was inspired by malice or sadism rather than a merely careless or unwise excess of zeal). Here, viewing the facts in a light most favorable to plaintiffs, there is no evidence suggesting malice or sadism, nor is there evidence suggesting Freeman's conduct was arbitrary or "conscience shocking.".

At a minimum, Freeman is entitled to qualified immunity on this claim. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The protection afforded by qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting Butz v. Economou, 438 U.S. 478, 507 (1978)).

There is generally a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the alleged acts violate a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001) (receded by Pearson v. Callahan, 555 U.S. 223 (2009)) (finding Saucier step beneficial, but not mandatory). Second, the court must decide whether the right at issue was "clearly established" at the time of Freeman's alleged misconduct. Id. A right is "clearly established" for purposes of qualified immunity analysis when the contours of the right are "sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

As noted above, even assuming plaintiffs' version of the facts, there existed some significant mental health concerns with respect to J.L.B. She admitted she was depressed, could not control her crying, and was cutting herself. While plaintiffs present defendant Freeman as overly zealous in her

speculation about abuse and suicidal ideation, it is not clearly established that Freeman's conduct in taking J.L.B. for a mental health evaluation and removing her from her parents home, violates substantive due process rights. Accordingly, Freeman is entitled to qualified immunity and summary judgment is granted in favor of defendants on plaintiffs' substantive due process claim.

B.  Procedural Due Process and Unlawful Seizure

The Fourth Amendment and procedural due process guarantee that parents will not be separated from their children without due process of law except in emergencies. Mabe v. San Bernardino County, Dept. of Public Services, 237 F.3d 1101, 1106-07 (9th Cir. 2001) (removing child without a warrant is unlawful absent certain circumstances and the Fourteenth Amendment guarantees parents will not be separated from their children absent due process). Accordingly, the due process claim and unlawful seizure claim involve the same constitutional analysis.

1.  The Medical Evaluation

Defendants contend the only person who made a judgment call to transport J.L.B. to the hospital for evaluation was Officer Turner who is not a defendant in this action. However, as noted above, there is an issue of fact as to whether that judgment call was made by Freeman or Officer Turner.

The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state. See Parham v. J.R., 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless a "neutral fact finder" determines, through a due process hearing, that parent is not acting in child's best interests); see also Calabretta v. Floyd, 189 F.3d 808 (9th Cir. 1999) (holding that "[t]he

government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents."). In the absence of parental consent, any examination of a child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that administration of the procedure is reasonable under all the circumstances. van Emrik v. Chemung County Dept. of Social Servs., 911 F.2d 863, 867 (2d Cir. 1990). Barring a reasonable concern that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations. Wallis, 202 F.3d at 1141.

Given J.L.B.'s declaration, there is a genuine issue of fact as to whether there was a reasonable concern that an urgent medical problem existed justifying bypassing judicial approval prior to the exam. She states she repeatedly assured Freeman her parents did not abuse her and did not admit to suicidal ideation. While it appears there were statements from others that J.L.B. exhibited a danger to herself, it is best left to a jury to decide the facts. Plaintiffs raise issues of Freeman's credibility and thus summary judgment on plaintiffs' procedural due process and unlawful seizure claims is not appropriate with respect to J.L.B.'s removal from school for a medical evaluation. See Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 255 (1986) (trial courts should act with caution in granting summary judgment and may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial).

    2.    Removal of J.L.B. from her Parents Home and Placement with Grandmother

Defendants argue that J.L.B. was never removed from her parents custody, but that she was placed with her grandmother under a voluntary protective action.

A state actor

> may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse .... Moreover, the police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed.... Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations.

Wallis, 202 F.3d at 1138 (citations omitted).

The court uses an objective standard to determine whether the information provided to an official provides that official with reasonable cause to believe exigent circumstances exist. See id. at 1139 n. 9. No fixed formula determines exigency, and courts consider the totality of the circumstances. See Doe v. Kearny, 329 F.3d 1286, 1295 (11th Cir. 2003). Relevant factors that can weigh in favor of exigency include the following: (1) the parents' credibility (see Ram v. Rubin, 118 F.3d 1306, 1309 (9th Cir. 1997) and Gomes v. Wood, 451 F.3d 1122, 1125 (10th Cir. 2006)); and (2) the age of the child (see Dietz v. Damas, 932 F.Supp. 431, 447 (E.D.N.Y.1996) (noting that while a child's report of abuse or neglect can serve as compelling evidence in the exigency analysis, "babies [are] incapable of testifying")). Accepting plaintiffs' version of the facts, there is very little specific, articulable evidence that provided reasonable cause to believe that J.L.B. was in imminent danger of abuse. While Freeman did articulate such facts,[4] as noted above, there is a credibility issue

---

[4] While information gathered at the hospital on Dr. Anderson's behalf did corroborate, to some extent, Freeman's assertions that J.L.B. admitted to suicidal ideation (transient) and induced vomiting, it is not clear that such admissions were relayed to Freeman or whether they constitute reasonable grounds to believe J.L.B. was in imminent danger of abuse from her parents. See Ex. 2 attached to Declaration of Sharia Mayfield (#47)

that is best left to a jury to decide. Nonetheless, defendants assert that no such determination is necessary because J.L.B.'s parents voluntarily agreed to J.L.B.'s placement with her grandmother, and mother agreed to limited contact while father agreed to no contact. Again, there is a genuine issue of material fact as to whether there was a voluntary agreement given that the plaintiffs assert Freeman threatened both their arrest and J.L.B.'s placement in foster care.[5]

> As noted in Sangraal v. City San Francisco, 2013 WL 3187384, (N.D.Cal. June 21, 2013):
>
> No Ninth Circuit case addresses whether safety plans such as ... one [that allegedly was obtained through threat of taking away the child] are inherently coercive. In Dupuy v. Samuels, the Seventh Circuit rejected the parents' argument that "safety plans are inherently coercive when agencies force parents to sign the plan or face the threat of formal removal proceedings" because the safety plan is still voluntary. 465 F.3d 757, 759–63 (7th Cir.2006); see also Teets v. Cuyahoga County, Ohio, 460 Fed. App'x 498, 503 (6th Cir. 2012) (granting summary judgment against parents' procedural due process claim because feeling coerced is insufficient to establish that a safety plan is involuntary). Judge Posner analyzed the constitutionality of an Illinois child-welfare agency's practice of offering "safety plans" to parents in lieu of removing the child. Dupuy, 465 F.3d at 760. Though the restrictions imposed under a safety plan may be less onerous than removal, "they may be invasive enough to count as deprivations of liberty ...." Id. "Critically, however, the decision to agree to a safety plan is optional with the parents." Id. at 761. "The state does not force a safety plan on the parents; it merely offers it." Id. "Because the safety plan is voluntary, no hearing of any kind is necessary; hearings are required for deprivations ordered over objection, not for steps authorized by consent." Id. at 761–62; see also Hernandez ex rel. Hernandez v. Foster, 657 F.3d 463, 482 (7th Cir. 2011) (quoting the same passage for the proposition cited). Analogizing safety plans to settlement agreements, the court held that "[i]t is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights.... Coercion is objectionable—and when objectionable is more aptly described as duress or extortion—when illegal means are used to obtain a benefit." Dupuy, 465 F.3d at 762 (finding no evidence of coercion). Id.

---

[5] Plaintiffs argue the need for a signed agreement based on OAR 413-020-0000 (43) (defining voluntary placement agreement as a written agreement) and OAR 413-00-075 (requiring all persons with legal custody to sign the placement agreement). Defendants assert that a protective action under OAR 413-015-0435 (as it existed in 2014) does not require a signed written agreement only documentation. Regardless, procedural due process constrains the actions of DHS with respect to the actions taken.

However, in this case the threats exceeded threats of instituting proceedings to remove J.L.B. The threats allegedly included arrest made while a police officer was present, and an instruction to conduct a search of the Bosisto residence. In addition, it is unclear what agreement was made in the absence of a writing, thus the existence of the agreement itself presents a genuine issue of fact. Based on the record before the court, summary judgment as to the procedural due process and unlawful seizure claims is inappropriate.

Moreover, qualified immunity is inappropriate because further factual development is necessary to determine if Freeman reasonably believed a voluntary placement agreement through a protective action existed. If a jury concludes that she did not so believe and that exigent circumstances did not reasonably exist, then she would have violated a clearly established right to familial association. Under such circumstances, the right was sufficiently clear in that a reasonable official would understand that what she was doing violated that right. See Shahid v. Gulf Power Co., 291 F.2d 422, 429 (5th Cir.1961) ( "Without intimating any conclusion on the merits ..., we nevertheless conclude that it is the part of good judicial administration for the facts in this to be more fully developed before the trial court determines that there is truly no genuine issue as to any material fact."); Bingham, Ltd. v. United States, 724 F.2d 921, 927 (11th Cir. 1984) (same); Eby v. Reb Realty, Inc., 495 F.2d 646, 649 (9th Cir.1974) ("In certain cases summary judgment may be inapposite because the legal issue is so complex, difficult, or insufficiently highlighted that further factual elucidation is essential for its prudently considered resolution.").

C.      Leave to Amend

Plaintiffs seek leave to file a second amended complaint ostensibly because Freeman is no

longer employed by DHS. Plaintiffs seek to add John Radich, District Manager of the Lane County Department of Human Services, as an appropriate official with supervisory duties at DHS for purposes of the equitable relief claim.[6]

Plaintiffs instituted this action February 27, 2016. On June 30, the court extended the discovery and pretrial order deadline to November 29, 2016. Plaintiffs filed an amended complaint on August 6, 2016. On August 23, 2016, defendants moved to dismiss the damages claims against DHS under the Eleventh Amendment and the equitable relief claim for failure to allege facts or a statutory basis independent of any previous claim. See Motion to Dismiss (#12). On October 6, 2016, the court ruled from the bench granting the motion dismissing the damages claim against DHS and allowing plaintiff to amend the equitable relief claim. See Minutes of Proceedings (#17).

Defendants filed an answer to the amended complaint and a motion for summary judgment on November 29, 2016. On December 15, 2016, plaintiffs sought an extension to January 19, 2017, to respond to the motion for summary judgment. The court granted the extension on December 22, 2016.

On December 19, 2016, plaintiffs filed the motion for leave to amend that is currently before the court (absent a copy of the proposed amended complaint). Defendants responded to the motion for leave on December 23, 2016 and on December 27, 2016, plaintiffs filed an amended motion for

---

[6]The operative complaint does not seek equitable relief against defendant Freeman, but against defendant DHS. Amended Complaint (#11) at ¶¶ 40-42. Although the court previously dismissed the damages claims against DHS under the Eleventh Amendment, the equitable relief claim was not dismissed on this basis. The proposed amended complaint does seek to enjoin Radich from placing children outside their homes in protective custody, foster care, or with another family member absent affording an opportunity to be heard, but also makes allegations against him for purposes of punitive damages. See See Proposed Amended Complaint (#30-1) at ¶¶ 32, 39, 45. Thus, it appears plaintiffs seek to add Radich for reasons in addition to substantiating the equitable relief claim.

Page 16 - ORDER

leave to amend, this time with the proposed second amended complaint attached.

On December 29, 2016, plaintiffs moved to continue discovery in part because of the need for further discovery should the leave to amend be granted. See Motion for Extension (#32). On January 18, 2017, this case was reassigned to the undersigned. The court denied the motion for extension on January 20, 2017, but allowed plaintiffs to file their response to the summary judgment motion by February 3, 2017.

Federal Rule of Civil Procedure 15(a) holds that leave to amend "shall be freely given when justice so requires." See Bowles v. Reade, 198 F.3d 752, 757 (9th Cir.1999). But the court need not grant amendment when it prejudices the opposing party Id. at 758. As noted by the sequence of events above, plaintiffs waited well over two months after the court ruled on the motion to dismiss to seek leave to amend. In addition, the motion for summary judgment had been filed nearly one month previous and all pertinent deadlines had already passed. Granting leave to amend at this stage of the proceedings would unfairly prejudice the defendants. The motion is denied.

## CONCLUSION

Defendants' motion for summary judgment (#19) is granted in part and denied in part as noted above. Plaintiffs' motions for leave to amend (#25 and #30) are denied. The parties are directed to lodge a pretrial order within 30 days from the date of this order.

DATED this 18th day of May 2017.

    s/Jolie A. Russo
JOLIE A. RUSSO
United States Magistrate Judge